UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA           CRIMINAL NO. 3:17CR164(JBA)

       v.

                                          June 2, 2020

BHARAT PATEL


GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION FOR COMPASSIONATE RELEASE

In May of this year, The Bureau of Prisons (hereinafter the "BOP") committed to move the defendant, Mr. Bharat Patel from confinement at the Camp in Fort Devens (hereinafter "the Camp") to home confinement on July 15, 2020 – the date at which he will have served two-thirds of the term of imprisonment – due to his age and health issues pursuant to its powers under the First Step Act's amendments to 18 U.S.C. § 3624(c)(2).  On May 26, 2020, Mr. Patel filed an emergency motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A) because of the COVID-19 pandemic, arguing that "extraordinary and compelling reasons," specifically, that he is a 73 year-old who suffers from heart disease, hypertension and Type 2 diabetes.  *See* 3:17CR164(JBA), Docket Entry No. 137 (hereinafter "Doc. 137").  Mr. Patel argues that allowing him to remain at the Camp in Fort Devens until July 15 "increases the risk of severe health complications or even death."  *Id.* As Mr. Patel noted in his motion, the Government defers to the Court, but the Government submits this filing so that the Court is fully aware of the Government's position and its view on the differences between home confinement pursuant to 18 U.S.C. § 3624(c)(2), and  immediate release pursuant to 18 U.S.C. § 3582(c)(1)(A).


I.       **Background and Procedural History**

By way of background, Patel was a general practitioner, and never held himself out as a pain management specialist—a medical doctor who has received extensive training in the treatment of persons with ongoing pain. Patel was participating providers with Medicare and the Connecticut Medicaid Program, of which "Husky" is a part.  Patel was the owner of Immediate Health Care before he sold it to co-defendant Ramil Mansourov in 2012. After the practice was sold, it reopened under a new name, Family Health Urgent Care.  As he received quarterly payments for selling the practice to Mansourov, Patel continued as an employee, each year spending more and more time in India.

Patients of Dr. Patel informed law enforcement that Dr. Patel took cash payments in exchange for prescriptions for opioids that Dr. Patel would write; although he wrote opioid prescriptions for his patients, Dr. Patel often would not even examine them.  A number of patients described how they only became opioid addicts after receiving prescriptions from Dr. Patel and one patient video recorded an encounter with Dr. Patel:  the patient was not examined and received the initial prescription, which the patient and Patel agreed would be paid for by Medicaid.  The patient then told Patel that he (the patient) had to go away for two weeks.  The patient handed Patel a $100 bill and Patel asked what date he should write on the prescription.  The patient said you are the doctor, and Patel replied words to the effect of "it is your show."  The patient then handed over seven more $100 bills and Patel provided him with seven more prescriptions for opioids.  Patel then showed the patient the blank cardboard back of his prescription pads and said, "No more prescriptions."  Patel then pocketed the $800 and handed the patient's file with only the Medicaid prescription to the nurse at the desk.

Patel's prescribing practice also caught the attention of pharmacists. One pharmacist informed the DEA in September of 2016 that he or she had not filled Patel's prescriptions for

approximately two years, as it was a "known fact" that Patel wrote many painkiller prescriptions and traveled back and forth to India. In January of 2017, a second pharmacist informed the DEA about a patient for whom Patel had prescribed Norco tablets approximately every three days; the patient could not physically have been capable of taking the prescribed amount of Norco tablets, as it would have made the patient's liver toxic. According to the pharmacist, this patient had a long history of filling prescriptions for Norco 10/325 milligrams, paying with Medicaid, discount cards, and cash. Furthermore, Patel provided the same Hydrocodone prescriptions to this patient in rapid succession. When the pharmacist tried to contact Patel's office about this patient, she did not hear back.  During the execution of a search warrant at Patel's home on the day of Patel's arrest, DEA agents found a letter from CVS pharmacy alerting Patel to his practice of indiscriminately prescribing opioids and asking him to change his ways.  Patel never responded to CVS.

Patel also routinely post-dated prescriptions. According to information supplied by Customs and Border Protection (CBP), Patel traveled twenty-two times between January 16, 2012 and March 17, 2017.  Foreign destinations included Costa Rica, the Dominican Republic, India, Mexico, South Africa, the Netherlands, and the United Arab Emirates (the latter two likely transit ports for travel to India).  On all occasions before Patel departed for extended travels outside the country, he provided his patients with post-dated prescriptions; that is, he wrote future dates on the prescriptions that matched future dates on which he would be traveling abroad.  For example, Patel dated prescriptions to appear as though he wrote them between November 30, 2016 and March 7, 2017, the entire period during which Patel was in India and not conducting medical examinations of the patients who were filling the narcotic prescriptions. During that period, thirty-two of Patel's patients received 200 prescriptions, filled these prescriptions, and fraudulently obtained over 12,000 narcotic pills. Specifically, Patel post-dated prescriptions to the patient who

video recorded his encounter with Dr. Patel. He told that patient that the patient could pay for prescriptions in advance, before Patel left for vacation abroad. Thus, for example, in 2015, the patient paid Patel $900 for nine prescriptions for Hydrocodone/Acetaminophen 10/325 milligrams because Patel was going to be traveling abroad for three months. In fact, whenever Patel traveled for extended vacations, the patient paid Patel in advance for several prescriptions. For example, on November 23, 2016, the patient paid Patel $1,700 in cash for seventeen prescriptions for Hydrocodone/Acetaminophen 10/325 milligrams, all post-dated, because Patel would soon depart for a three-month vacation. The patient actually obtained twenty-three prescriptions and owed Patel $600 on his next visit. While writing out the prescriptions, Patel went through a calendar with CS #3 and post-dated the prescriptions for each Tuesday and Saturday.  Patel signed all of the prescriptions on November 23, 2016, and the patient took possession of the prescriptions from Patel in the examination room on that date.

A Connecticut probation officer told the DEA that Patel's prescribing practice resembled that of an operating "pill mill." Additionally, on November 4, 2015, a patient overdosed in a vehicle parked directly in front of Family Health Urgent Care. This patient survived.  A Family Health Urgent Care employee described how she recognized the patient as one of Patel's and was surprised that Patel, despite watching the resuscitation efforts by an EMS worker who by chance was in the parking lot, never offered aid or information about the patient to the EMS worker.

Patel's fraud on Medicaid stems from (1) the billing Family Urgent Health Care received as a result of his appointments with Medicaid patients (including CS#3) who were obtaining opioids they did not need, and more importantly (2) from those Medicaid patient's filling of the multiple prescriptions that were not medically necessary at pharmacies; Medicaid paid for those

unnecessary prescriptions because Patel prescribed them (Medicaid had no idea he was getting $100 per prescription and that the prescriptions were not medically necessary).

On July 12, 2017, Patel was arrested at his house.  After his arrest, Patel was read his rights per Miranda and agreed to waive them.  When asked if he had ever given prescriptions for cash, Patel denied ever doing such a practice.  Patel was then shown a video of CS#3 providing eight one-hundred dollar bills in exchange for Patel providing him with eight prescriptions for hydrocodone.  Patel said this was the only patient for whom he provided such an exchange and then asked the interviewer who the patient was.  When asked why he could not recall the only patient for whom he violated his Hypocratic oath, Patel then stated that he received no more than "$100-$200 a day on average" from the practice of charging for extra prescriptions, but estimated that he made at  most $5,000 per month from the practice.  When asked about the cash deposits into his account, Patel stated that he saved money from interest and other things.  Despite Patel's bank account showing bi-weekly electronic deposits of his paycheck from Family Health as well as quarterly payments for the sale of the business, Patel said that the cash deposits in his account were because he cashed his paychecks because he did not trust Mansourov.  Patel also admitted that he used to leave prescriptions at his wife's liquor store, which was adjacent to Family Health and that his patient/addicts would pick up the prescriptions from Patel's wife's store, leaving $100 bills in envelopes for Patel.

### B.   Procedural Background

On July 26, 2017, a Bridgeport Grand Jury filed a four count indictment charging Patel, and co-defendant Mansourov, with violations of Title 21, United States Code, Section 846 (Conspiracy to Distribute Oxycodone and Hydrocodone), Title 18, United States Code, Section 1347 (Health Care Fraud), and Title 18, United States Code, Section 1956(a)(1)(A)(i) &

(B)(i)(Money Laundering).  On June 25, 2018, Patel pleaded guilty to Conspiracy to Distribute Oxycodone and Hydrocodone and Health Care Fraud.

Patel's guilty plea was based on a plea agreement with the Government.  In that plea agreement, the parties stipulated that Patel's relevant and readily foreseeable conduct involved 405 grams of illicitly prescribed oxycodone.  On October 12, 2018, this Court sentenced Mr. Patel to 54 months of imprisonment, to be followed by a term of supervised release of 36 months.

## II.     Applicable Law and Administrative Requirements

Mr. Patel moves for release under 18 U.S.C. § 3582(c)(1)(A)(i).  Even assuming he has satisfied the administrative requirements for such relief, he cannot meet the statutory requirements. Section 3582(c)(1)(A)(i) states:

> The court may not modify a term of imprisonment once it has been imposed except that—
> (1) in any case—
> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
> (i) extraordinary and compelling reasons warrant such a reduction.

18 U.S.C. § 3582(c)(1)(A)(i).  Section 1B1.13 of the Sentencing Guidelines further explains that a sentence reduction under § 3582(c)(1)(A) may be ordered where a court determines, "after considering the factors set forth in 18 U.S.C. § 3553(a)," that "(1)(A) extraordinary and compelling reasons warrant the reduction; . . . . (2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and (3) the reduction is consistent with this policy statement."  A defendant released pursuant to Section 3582(c)(1)(A)(i) has his or

her sentence terminated and immediately begins a period of supervised release. "The Court does not have authority under 18 U.S.C. § 3582(c)(1)(A) to place a prisoner in home confinement." *United States v. Williams*, 2020 WL 2300206, *3 (W.D. Tenn. May 1, 2020)(citing *Miller v. United States*, 2020 WL 1814084, at *2 (E.D. Mich. Apr. 9, 2020) (collecting cases)).

In marked contrast, under 18 U.S.C. § 3624(c)(2), the Bureau of Prisons may allow certain prisoners to be released to home confinement for the remainder of their sentence. While generally, such home confinement release can only be provided to a prisoner who has the lesser of six months or ten percent of their sentence remaining, eligible elderly offenders – those over 60 years of age who were not convicted of a crime of violence or sex offense, and who is not a risk to the public if released to home detention – can be released earlier. That released prisoner will not begin supervised release until the conclusion of his or her court-ordered sentence.

### III.    Analysis.

As noted above, the Government defers to the Court to determine whether to grant relief pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), which would commute Mr. Patel's sentence to time served or to defer to the BOP's decision to transfer him to home confinement on July 15, 2020. The undersigned telephoned Stephanie Scanell-Vesella, Senior Staff Attorney for the Consolidated Legal Center Devens, and Attorney Scanell-Vesella confirmed that as of June 2, 2020 there were no cases of COVID-19 at the FMC-Devens (the Camp), where Mr. Patel is housed until July 15, 2020. Although there are cases of COVID-19 for inmates at Devens' medical facility, those inmates have no contact with the inmates at the Camp. Indeed, Devens' Camp is following all the protocols in "Phase 6" as outlined in the BOP website, to include: the suspension of social visits; the suspension of inmate internal movement, with limited exceptions; staggering of meal and recreation times; screening of staff and inmates; and modified operations to maximize social

distancing, including, as demonstrated by the medical records, reduced recreation time to allow for social distancing.  The Camp screens all inmates, including Mr. Patel with daily temperature checks and screenings by a registered nurse.  In fact, if he displays any symptoms, Mr. Patel is in close proximity to a medical facility.  Should an inmate or staff member at the Camp be determined to present exposure risk factors, and be asymptomatic, that inmate will be quarantined and should an inmate prove symptomatic with exposure risk factors, that inmate will be isolated and tested per local Massachusetts health authority protocols.

On the one hand, the Government recognizes the serious risk to Mr. Patel if he contracts COVID-19 while housed at FMC Devens.  On the other hand, the Government observes that the Camp at which Mr. Patel is housed is COVID-19 free, and Mr. Patel is possibly at less risk at the Camp then he is in the general public.  Allowing the BOP to follow through with its decision to move Mr. Patel to home confinement on July 15, 2020 will allow Mr. Patel to serve the sentence this Court imposed on him due to the Section 3553(a) factors.  For the above-stated reasons, the Government respectfully defers to the Court on Mr. Patel's motion.

Respectfully submitted,

JOHN H. DURHAM
UNITED STATES ATTORNEY

_____/s/_____
RAHUL KALE
Federal Bar No. PHV02526
1000 Lafayette Blvd., 10th Floor
Bridgeport, CT  06604
Tel.: (203) 696-3000

CERTIFICATE OF SERVICE

I hereby certify that on June 2, 2020, a copy of the foregoing was filed electronically.

Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing

system.  Parties may access this filing through the Court's CM/ECF System.


<u>            /s/            </u>
RAHUL KALE
ASSISTANT UNITED STATES ATTORNEY